IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL EDWARD JOHNSON, #335470 *
    Plaintiff
    v.     *   CIVIL ACTION NO. JFM-10-1199

J. MICHAEL STOUFFER, Commissioner *
BOBBY SHEARIN, Warden,1
FRANK B. BISHOP, Chief of Security, *
HARLEY GEOFF, Officer,
DONALD DRYBOLA, Officer, *
SGT. JANET PUFFENBARGER, Officer,
OFFICER BARYARDER, *
CARLA BUCK, R.N.,
JENNIFER HOSIER, R.N, *
AUTUMN DURST, R.N.,
TIMBERLIE ADAMS, R.N., *
DR. MADJ ARNAOUT,
CORRECTIONAL MEDICAL SERVICES, INC.
MARTIN O'MALLEY, Governor *
    Defendants
    ***

MEMORANDUM

Pending is a moiton to dismiss or for ummary judgment filed by defendants Timberlie Adams, Dr. Arnount, Carla Buck, Correctional Medical Services Inc., Autumn Durst, and Jennifer Nosier[2] ("medical defendants"). ECF No. 14. Also pending is a motion to dismiss or for summary judgment filed by defendants C. Bishop, Drybola, G. Geoff, Martin O'Malley, Officer Puffenbarger, B. Shearin, and J. Michael Stouffer ("state defendants"). ECF No. 18. Plaintiff has not responded to the defendants' motions.[3] The case is ripe for dispositive review.

---

[1] The clerk shall amend the docket to reflect the full and proper spelling of defendant's names.

[2] Officer Baryarder has not been properly served with the complaint. Presumabley, plaintiff intended to name Officer Bradley Baumgardner. For the reasons that follow, even if Officer Baumgardner had been properly served plaintiff's claims against him would be subject to dismissal. Accordingly, the claims against Baryarder ("Baumgardner") shall be dismissed.

[3] Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), on August 16, 2010 and

Upon review of papers and exhibits filed, the court finds an oral hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2010).

**Background**

Plaintiff alleges that he was subjected to excessive force by correctional employees He states that on April 19, 2010, Officer Baumgardner sprayed him with pepper spray, denied him medical treatment and wrote a false infraction. He further alleges that on April 25, 2010, Officers Geoff and Drybola used pepper spray on him and wrote a false report. He states that on April 30, 2010 he was denied an attorney visit. He also complains that Sgt. Puffenbarger denied him exercise and walks for over ninety days and that an unnamed officer would not let him assist other inmates by passing legal documents to segregation inmates.

In addition, plaintiff states that he was denied medical treatment for a number of injuries and conditions, and that Nurse Buck denied him treatment for exposure to pepper spray. ECF No. 1.

**Allegations Against State Defendants**

The uncontroverted evidence reveals that on April 19, 2010, Officer Baumgardner was making security rounds in the infirmary, and observed plaintiff yelling. Plaintiff was instructed to stop but he declined, saying, "Fuck you the nurses are trying to kill me." He pulled his mattress down and attempted to pull metal off his bunk. Again ordered to stop, he responded "Fuck you. I'll fuck you up or I'll fuck myself up I just want to end this shit." He then beat his shower chair against the cell window. Baumgarnder again directed plaintiff to stop. Plaintiff

---

September 29, 2010, plaintiff was notified that defendants had filed dispositive motions, the granting of which could result in the dismissal of his action. ECF Nos. 15 & 19. Plaintiff was also informed that he was entitled to file materials in opposition to motions within seventeen (17) and that his failure to file a timely or responsive pleading or to illustrate, by affidavit or the like, a genuine dispute of material fact could result in the dismissal of his case or in the entry of summary judgment without further notice of the court. *Id.*

began beating his head against the cell window. Baumgardner sprayed a burst of pepper spray into plaintiff's feed up slot and directed plaintiff be handcuffed. Plaintiff refused. Several more orders for compliance were issued before plaintiff finally complied. Officer Barnes also witnessed plaintiff hitting his head against the door and his rejection of several orders to cease. Plaintiff was seen by a nurse and returned to the infirmary. He suffered no respiratory distress as a result of the pepper spray, and his vital signs were stable. He was given a shower in order to wash off the pepper spray. ECF No. 18, Ex. 1-A Officers Barnes and Baumgardner deny using any racial slurs toward plaintiff.. They also denied writing any false reports about the incident or denying plaintiff medical treatment. *Id*., Ex. 2 & 3.

On April 25, 2010, plaintiff was observed again engaging in disruptive behavior and attempting suicide. *Id*., Ex. 1-B. At approximately 4:20 p.m., urine and feces were observed coming out of plaintiff's cell. Officer Kifer advised Officer Puffenbarger of this and was directed that the water should be turned off in plaintiff's cell. Later that evening Puffenbarger observed that feces, urine and parts of adult diaper had been pushed onto the tier from under plaintiff's cell door. Id. Plaintiff, advised that his conduct would not be tolerated, he stepped to the back of his cell and began yelling "Let's get together and take this place down." Plaintiff was ordered to come to the slot to be handcuffed. He refused, saying, "Come and fucking get me." After a few minutes he complied and submitted to handcuffing. He was escorted to the C/D education booth where he was strip searched and given fresh clothing. He then refused to leave the booth and was physically returned to his cell. *Id*. Ex 1-B & Ex. 1-C.

Later that evening plaintiff was observed in his cell with what appeared to be white rope around his neck with the other end tied to the window. Officer Geoff ordered plaintiff to remove the rope but plaintiff refused. Geoff then shot several short burst of pepper spray into the cell

and called for assistance. Officers Drybola, Keefer, Friend and Geoff entered the cell and removed the rope from the window. Plaintiff became combative and was placed in hand restraints and the rope removed from his neck. He was seen by Nurse Adams. He complained of burning from the pepper spray and pain in the back of his neck. Erythema (redness) was noted around his neck. His respiration was normal and no acute distress was noted. He was returned to the holding cell to wash off. Instead, plaintiff stretched string and placed it in his mouth in an effort to choke himself. Officers used pepper spray and force to prevent plaintiff choking. Dr. Ottey instructed that plaintiff be stripped and placed in a vest in a holding cell with an inmate observer. Medical entries indicated that plaintiff was observed moving all extremities and oriented. He had no obvious injuries and expressed no medical complaints. *Id.*, Ex. 1-B.

Sgt. Puffenbarger denies refusing walks to plaintiff unless there was an institutional emergency or plaintiff's behavior created an unsafe environment for staff, other inmates or himself. She indicates that to her knowledge plaintiff has not been denied walks or exercise for over ninety days. *Id.*, Ex. 4.

There is no evidence that plaintiff was denied an attorney visit on April 30, 2010. Id. Ex. 1.

**Allegations Against Medical Defendants**

**Plaintiff's treatment for urinary incontinence**

Nurse Shipley evaluated plaintiff upon his arrival at NBCI on February 1, 2010, at the request of security staff. She found plaintiff lying in his cell. He stated that he could not walk. He was incontinent. Plaintiff was transported by wheelchair to the medical room. Plaintiff advised medical staff that he had been assaulted by the transport officers. He complained of back pain and pain in his right hand and advised medical staff that he performs self-catheterization to empty his bladder. The examination notes reveal that plaintiff was alert and

conversing with staff, his clothing was soiled with urine and feces, his right hand was slightly swollen, he had an old scar on the back of his neck, and he was in no apparent distress. Shipley referred plaintiff to the Chronic Care Clinic for follow-up evaluation and treatment as necessary.[4] After Shipley helped him clean himself, plaintiff was returned to his cell. Shipley had no further contact with plaintiff. ECF No. 14, Ex. A.

On March 25, 2010, Nurse Adams was asked by correctional employees whether plaintiff needed a urine collection bag. Adams noted in the medical records that, according to correctional staff, plaintiff had taken his urine bag and squeezed it until it burst then threw the bag and urine under his cell door onto the tier. Adams noted that plaintiff had been provided adult diapers, straight catheters, and had access to a toilet in his cell. Adams did not reissue a urine collection bag, and opted to have the physician evaluate plaintiff before issuing any additional urine bags. *Id*., Ex. A.

On April 3, 2010, plaintiff was provided three straight catheters and two condom catheters. On April 26, 2010, Dr. Arnaout evaluated plaintiff and ordered urinary catheterizations as needed as recommended by the urologist, even though plaintiff was not then suffering urinary retention. Arnaout noted that he did not see a medical reason for plaintiff to use a Texas catheter and recommended that plaintiff perform self-catheterization as needed when he felt he was retaining urine and then return the catheter, bag, and urine collected. Arnaout also found no physical reason why plaintiff needed to self-catheterize, noting that if he had a true neurogenic bladder plaintiff would not be able to feel when he was retaining urine. Arnaout opined that there may be a psychiatric explanation for plaintiff urinating on himself or the floor. Plaintiff continues to be followed by the psychiatric department, continues to receive condom

---

[4] Plaintiff has a history of spinal stenosis, bipolar disorder, and impulse control disorder, and uses adult diapers and condom catheters for incontinence/urinary retention. *Id*., Ex. C.

catheters and straight catheters, and has been referred for outside medical consultation. *Id*., Ex. A.

**Medical Treatment for Epilepsy**

Plaintiff has a history of refusing to take prescribed seizure and psychiatric medications. *Id*. On February 3, 2010, plaintiff was transferred to the infirmary for observation due to possible seizures after not responding to officers on his tier. Dr. Ottey evaluated plaintiff, found that plaintiff was not postictal,[5] and noted that plaintiff has been refusing his antiepileptic medications. Ottey discussed with plaintiff the importance of taking his medications. On February 4, 2010, Dr. Espina noted that plaintiff's tests for epilepsy were negative and that plaintiff refused all psychiatric and seizure medications. Plaintiff was discharged back to his housing unit on or about February 10, 2010.6 *Id*.

On March 9, 2010, Nurse Durst responded to plaintiff's cell when he was found to be unresponsive and possibly postictal. Upon examination Durst found plaintiff to be drowsy but easily aroused, and his physical examination was normal. Durst noted that plaintiff was forcing himself to drool and spit foam. He stopped the seizure-like activity to respond to her. Durst's assessment was that plaintiff was "faking [his] signs and symptoms for attention" and advised the tier officer to notify the medical department if plaintiff appeared unconscious again. She further noted that no immediate intervention was necessary.

On March 14, 2010, plaintiff was again evaluated for possible seizure activity. Upon arriving at plaintiff's cell, Nurse Adams found plaintiff sitting on the floor with his back against the bunk and his eyes open. Adams noted that plaintiff acknowledged her arrival with eye contact and a few minutes later responded to verbal commands. Her assessment was possible

---

[5] A period of drowsiness that commonly follows a seizure.

[6] Neither Ottey nor Espina are named as parties herein.

pseudo-seizure behavior. *Id*.

On March 25, 2010, Nurse Bray responded to plaintiff's cell for possible seizure activity. Bray found plaintiff on his bunk, with his eyes open, but not responding to voices. Bray noted no injuries. When Bray took plaintiff's blood pressure, plaintiff sat up and began to respond to verbal commands. Plaintiff denied pain. He continues to be followed for possible seizure activity but refuses to take prescribed anti-seizure medication. *Id*.

**Plaintiff's Medical Treatment for Paraplegia**

While incarcerated at the Jessup Correctional Institution ("JCI"), plaintiff was admitted to the infirmary for a urinary tract infection and deep vein thrombosis. He was discharged from JCI on November 19, 2009. At that time Dr. Sisay noted that plaintiff reported numbness and an inability to use both of his legs and was incontinent of urine and feces. He was admitted to the University of Maryland Medical Center ("UMMC") on October 21, 2009 and returned from UMMC on October 25, 2009, with a diagnosis of paraplegia of unknown etiology. Dr. Sisay noted that plaintiff had been evaluated by a neurologist who found no organic neurologic cause for the paraplegia. Sisay further noted that the UMMC emergency physician reported that plaintiff's CT scan of the head, neck, chest, abdomen and pelvis were normal and that the MRI of plaintiff's cervical and thoracic spine showed nothing other than degenerative disc disease. *Id*., Ex. A.

While in the JCI infirmary, plaintiff was provided condom catheters and adult diapers but occasionally did not use them. Sisay noted that plaintiff did not have incontinence upon waking when he did not use the condom catheter or diapers. Sisay's examination of plaintiff revealed plaintiff had good rectal sphincter tone and his paraplegia had resolved for the most part upon his discharge from the infirmary. Sisay further noted that plaintiff was able to perform his daily

activities without support. On the day of his discharge from the infirmary, plaintiff assaulted a nurse and was physically be restrained by a security officer. Sisay further noted that plaintiff was receiving physical therapy but the physical therapist reported that plaintiff did not follow instructions. *Id*.

On February 1, 2010, security reported to Nurse Adams that plaintiff was able to rise and walk from the wheelchair provided during his transfer to the facility. Plaintiff was also observed walking to the psychiatrist's office earlier that day. On February 3, 2010, Dr. Ottey noted that plaintiff informed security officers that he used a wheelchair when he was in the prison mental health unit at Jessup. At the NBCI infirmary, plaintiff was observed standing at his bedside and pushing his stationary bedside table across the room. He was given a walker to use while in the infirmary. *Id*.

Plaintiff was evaluated by Dr. Mickel on February 9, 2010. Mickel noted plaintiff had been observed walking and using his feet in a purposeful manner. Mickel tested plaintiff's plantar reflexes in both feet and found them to be normal, indicating that plaintiff had normal central nervous system control of his movements. Mickel noted atrophying of plaintiff's muscles in his lower extremities and advised plaintiff that continued use of a wheelchair would only contribute to more atrophy. When plaintiff was discharged from the infirmary he was not provided a wheelchair. Rather, Mickel ordered a physical therapy evaluation and six sessions of physical therapy. *Id*., Ex. A.

On March 14, 2010, plaintiff was evaluated in his cell for complaints of a nose bleed. Nurse Adams noted that when she arrived at plaintiff's cell he was standing at the door yelling, gesturing with both hands, and moving all extremities. Plaintiff refused to be examined and began jumping up and down, banging on the cell door and glass. Adams noted that entrance into

the cell was not necessary at that time based on her visual observation of plaintiff and his aggressive behavior. *Id.*

On March 18, 2010, plaintiff was evaluated by Physician's Assistant Schindler due to complaints of chest pain. Plaintiff advised Schindler that he could not move his right foot, "but he was able to pull himself up from his wheelchair, hop and twist in midair from the floor, over the step and onto the examination table." *Id.*, p. 18. Plaintiff complained that he was not receiving the correct medical supplies. Schindler's examination revealed that plaintiff was in no apparent distress and his exam was normal. *Id.*

On March 30, 2010, plaintiff was evaluated by Dr. Arnaout who noted that plaintiff's neurological examination was ambiguous and did not match any anatomical nerve distribution. When Arnaout repeated his examination, plaintiff's areas of weakness were different than in previous exams. While plaintiff complained of weakness in his right arm and leg, he was able to catheterize himself using his right hand. Additionally, plaintiff's reflexes were normal. Dr. Arnaout found that plaintiff was manipulating the examination. *Id.*

On April 15, 2010, the physical therapist observed that plaintiff was able to stand independently but was unable to walk due to the spasticity of his legs. The therapist noted that plaintiff had reached his optimum level of functional mobility and discharged him from therapy. *Id.*, Ex. A.

On April 20, 2010, plaintiff was observed standing erect and stable on his feet but ambulating unsteadily in his cell. He underwent x-rays of his cervical spine on April 21, 2010, which showed degenerative changes of plaintiff's spine at several levels. He was observed ambulating in his cell without assistance and moving all his extremities on April 25, 2010 and April 29, 2010. *Id.* He was scheduled for an electromyography test on June 11, 2010. He

refused to be transported for the appointment. *Id*

**Hearing Loss and Ear infection**

On April 26, 2010, plaintiff complained of mild pain behind his left ear and drainage. Dr. Arnaout observed pus draining from plaintiff's left ear canal. He was diagnosed as suffering from an infection of the external ear canal and prescribed antibiotics. Id. Plaintiff did not complain any further regarding his ear. On June 14, 2010, however, Dr. Arnaout evaluated plaintiff for follow-up of the ear infection. He observed that plaintiff still had puss draining from his left ear, tenderness of the mastoid bone behind the ear, and severe hearing loss. Plaintiff's right ear was normal. Dr. Arnaout submitted a reconsultation request for plaintiff to be evaluated by an otolaryngologist. He also prescribed corisporin ear drops and additional antibiotics. The otolaryngologist also recommended corisporin ear drops and they were reordered for plaintiff. The infection resolved with no further treatment. *Id*.

**Other Complaints**

Dr. Arnaout avers that contrary to plaintiff's compliance, since Dr. Arnaout has been the Regional Physician in NBCI, plaintiff has not complained of malunion of a fracture of his left hand, a fracture of his right hand or urinary tract infection. Nor has plaintiff been denied treatment for any life-threatening illnesses, treatment ordered by medical trauma team, any medication ordered by an "x-ray doctor," or any consultation approved by Wexford Health Services, Inc. *Id*., Ex. A.

### Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Analysis

**A.  Respondeat Superior**

Plaintiff's complaint against Martin O'Malley, Michael Stouffer, B. Shearin, and Correctional Medical Services, Inc. is based solely upon the doctrine of *respondeat superior,* which does not apply in §1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983); *see also Trulock v. Freeh*, 275 F. 3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit). Liability of supervisory

11

officials must be "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001), *citing Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984). Supervisory liability under § 1983 must be supported with evidence that (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff, (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994). Plaintiff has pointed to no action or inaction on the part of Martin O'Malley, Michael Stouffer, B. Shearin, and Correctional Medical Services, Inc. that resulted in a constitutional injury, and accordingly, his claims against them shall be dismissed.

**B.    Excessive Force**

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992). This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *See Whitley v. Albers*, 475 U. S. 312, 321 (1986). The absence of significant injury alone is not dispositive of a claim of excessive force. *See Wilkens v. Gaddy*, __ U.S. __, 130 S. Ct. 1175 (2010). The extent of injury incurred is one factor indicative of whether or not the force

12

used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Wilkens,* 130 S. Ct. at 1177.

Defendants deny that plaintiff was assaulted as alleged in the complaint. They explain that on each occasion the force used was minimal and was undertaken in order to keep the facility secure. Moreover, the force used was necessary in order to stop plaintiff from self-harm, including a suicide attempt. Additionally, the force was tempered in that plaintiff was given an opportunity to comply with lawful orders before and after each incident of pepper spray. Plaintiff was immediately taken for medical attention where he was permitted to wash off the pepper spray and no injuries were noted. In light of the foregoing, defendants are entitled to summary judgment.

**C.     Medical Care**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To state an Eighth Amendment claim for denial of medical care, plaintiff must demonstrate that the actions of defendants (or their failure to act) amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (no expectation that prisoners will be provided with unqualified

access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry. The second component of proof requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), quoting *Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris* 240 F. 3d 383 (4th Cir. 2001), citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken). Further, "[d]isagreements between an inmate and a physician over the inmate's proper care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

Plaintiff has failed to demonstrate that he has been denied medical care. Medical records indicate that plaintiff simply disagrees with the medical care provided to him. Such disagreement with a course of treatment does not provide the framework for a federal civil rights complaint but rather, at most, states a claim of negligence. *See Russell v. Sheffer*, 528 F. 2d 318 (4th Cir. 1975).

## **Conclusion**

For the reasons stated above, defendants'' motions for summary judgment shall be granted and plaintiff's claim against defendant Baryarder shall be dismissed. A separate order follows.

__February 22, 2011_____   ___/s/_____
Date                          J. Frederick Motz
                              United States District Judge